NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| CLAUDETTE HYATT, *et al.*, | : | **Hon. Dennis M. Cavanaugh** |
| | : | |
| Plaintiffs, | : | **OPINION** |
| | : | |
| v. | : | Civil Action No. 04-CV-1545 (DMC) |
| | : | |
| COUNTY OF PASSAIC, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by the Passaic County Prosecutor's Office ("PCPO"), Chief Assistant Prosecutor Joseph Del Russo, Assistant Prosecutor Christopher Freid, Detective Susan Bonds and Giselle Henriquez and cross-motion for summary judgment by James Avigliano and County of Passaic (collectively, with PCPO, Del Russo, Freid, Bonds and Henriquez, "Defendants"). Pursuant to FED. R. CIV. P. 78, no oral argument was heard. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Defendants PCPO, Del Russo, Freid, Bonds and Henriquez's motion for summary judgment is **granted**; and Defendants Avigliano and County of Passaic's cross-motion for summary judgment is **granted**.

I.      BACKGROUND[1]

A.      **Precipitating Events**

On June 15, 2001, Plaintiff Claudette Hyatt took her seven-year old daughter, Alicia Anderson, and her seventeen-year old daughter, Glenise Malcolm, to the Great Falls Pediatric Clinic. Staff members referred Anderson to Dr. Nina Agrawal, a pediatrician who specializes in child abuse. Plaintiff reported to Dr. Agrawal that Anderson had been suffering from a brown vaginal discharge for a couple of months, she was experiencing difficulties at school and was acting withdrawn and angry. Dr. Agrawal suspected sexual abuse. In response to direct questioning, Anderson advised Dr. Agrawal that Lavoisier Wallace, her common law uncle and a member of her household,[2] had been touching her "on her private part with [his] private part under her clothes." Malcolm, Plaintiff's other daughter, also advised that Wallace had abused her. Plaintiff told Dr. Agrawal that she was reluctant to report her daughter's abuse because of Wallace's relationship with the family.

The pediatric clinic promptly referred the case to the PCPO's Child Abuse Unit, which is led by Del Russo. The PCPO opened an investigative file, to which it assigned Detective James Arnold. Arnold immediately and repeatedly tried to call and left messages for Plaintiff, but his efforts were all to no avail.

On June 21, Arnold went to Plaintiff's residence and spoke with Malcolm. Arnold left his card with her, along with a letter addressed to Plaintiff requesting that she contact him. On

---

[1] The facts set forth in this Opinion are taken from the facts set forth in the Parties' FED. R. CIV. P. 56.1 statements in their respective moving papers.

[2] Plaintiff's household included her mother (Louise); her sister Andrea and her two minor children by Wallace, Michael and Maxine, and Wallace himself; her sister Juliet and her four children, all minors, Telicia, Tiffany, Tameka and Anthony and Plaintiff's three children, Anderson, Fabian (sometimes referred to as Andrew) and Glenise.

June 22, he called her again, but still received no return call. On June 25, he returned to the Hyatt residence and finally managed to find Plaintiff. Arnold explained that the PCPO needed to interview her and her children, so they scheduled a June 29 interview at the PCPO's Child Advocacy Center.

On June 29, Rachel Heath, a Child Interview Specialist employed by the PCPO, interviewed Plaintiff and Anderson and recorded the session on videotape. When asked whether Wallace ever put his private part on or in her mouth, Anderson responded that he would "open my mouth and put it in" getting "hair" in her mouth. When asked if Wallace ever touched her with his hand, Anderson responded that he touched her on her private part "on and inside." He threatened to hurt her by "slamming her on the floor" and "punching her" if she told anyone. These events occurred on multiple occasions in her Aunt's bedroom and in her grandmother's bedroom while no other adults were home.

As Heath was interviewing Anderson, Arnold interviewed Malcolm, who advised him that she caught Wallace sexually assaulting Wisdom, Malcolm's fifteen-year old cousin, several months earlier at the Hyatt residence. Malcolm also told Arnold that Wallace had abused her when she was younger. Arnold then interviewed Plaintiff, at which point Plaintiff told Arnold that she had learned of Wallace's assault on Wisdom on April 28, 2001, the night it occurred, and discovered a few weeks later that Wallace had been abusing Anderson.[3] When asked, Plaintiff stated that she was unaware of Wallace's whereabouts but that she thought he might have relocated to New York. Plaintiff also told Arnold that she was being pressured by her family not to cooperate with the investigation. Arnold's ensuing attempts to reach Plaintiff's sister, Andrea

_____

[3] From Plaintiff's statement to Detective Arnold, it is apparent that Plaintiff waited until June 15, 2001 – more than a month after first learning of Anderson's abuse by Wallace – to have her treated by a doctor.

Hyatt, to procure information regarding Wallace's whereabouts were equally unsuccessful.

As the PCPO was continuing its investigative efforts, the Division of Youth and Family Services ("DYFS") was conducting a parallel investigation with similar resistance from the family. DYFS caseworker Carlene Clyburn was unable to speak with the children until August 15 – two full months after Dr. Agrawal's referral – despite repeated attempts to contact the family. During the DYFS interview, Anderson told Clyburn that Wallace had touched her inappropriately on numerous occasions, that he threatened to choke or punch her if she told anyone and that he still visited the household regularly to pick-up his children, Michael and Maxine. While Clyburn was interviewing Anderson, another DYFS caseworker and Arnold interviewed Wisdom, who was then fifteen-years old. Wisdom told them that Wallace had once "touched her butt," but indicated that she did not want to cooperate with the investigation.[4]

### B.   Wallace's Arrest and Prosecution for Sexual Assault

On September 10, 2001, Arnold filed a criminal complaint against Wallace. A warrant issued, but the PCPO was unable to make an arrest because of a lack of information regarding Wallace's whereabouts. In April 2002, with Wallace still at large, Assistant Prosecutor Christopher Freid presented the case against Wallace to a Passaic County Grand Jury. After hearing the evidence, the Grand Jury indicted Wallace on nine counts, including aggravated sexual assault, sexual assault and endangering Anderson's welfare; aggravated sexual assault, sexual assault and endangering Malcolm's welfare; and attempted sexual assault, aggravated

---

[4] In a later statement, given in November 2001, Wisdom reported that Wallace had been molesting her since she was eleven-years old. During that interview, Wisdom's mother (Plaintiff's sister Juliet) stated that she did not want to involve herself or her daughter in the matter because of Wallace's relationship with the family.

sexual assault and attempted endangering Wisdom's welfare.

In May 2002, Wallace appeared for his arraignment accompanied by his attorney, Joseph Collini, Esq. As the criminal case proceeded, Wallace refused a plea agreement. Freid felt that Wallace knew that the victims' family did not want to see him prosecuted and that they would not participate or cooperate in the prosecution, so Wallace believed that he would be acquitted at trial.

The criminal case against Wallace was set for trial in early April 2003. In late February, Detective Aliano, the PCPO detective then responsible for assisting Freid, began trying to contact witnesses. Plaintiff's mother, Louise, advised him that Plaintiff had moved and refused to tell him where: "If you are the police, then you can find that out on your own," she told Aliano. Plaintiff's sister Juliet was equally unhelpful. She told Aliano, as she had told Arnold before, that she did not want her daughter to testify against Wallace and that she wanted the charges to be dropped. When asked where Plaintiff was living, Juliet offered a vague response that she lived "somewhere on 27th Street in Paterson" and said that she would "rather not" provide a telephone number.

On March 12, 2003, the PCPO received a call from Juliet and the family's pastor. They said they would come in with Plaintiff for a meeting with Freid on March 14, but they would not bring the children. At the ensuing meeting, Freid explained to Plaintiff and Juliet that he needed to meet with their children to familiarize them with the staff, courtroom and proceedings that would be taking place. He further advised them that if the children were not properly prepared to testify, they would not be effective witnesses at trial and there was a good chance that

Wallace would be acquitted. He also told them about his belief that Wallace would not entertain

a plea offer because he believed the children would never testify against him at trial. Plaintiff and

Juliet advised Freid that "their position remained the same and they would not bring their

children to this office to speak to us nor did they want their children to testify at the trial."

Following the meeting, the PCPO left several telephone messages for Plaintiff and Juliet. Juliet

called back twice and stated that she would not make Wisdom available to testify. She told

Detective Bonds that she was not concerned about being arrested. Plaintiff never returned any

telephone calls.

### C.    Plaintiff's Arrest

Faced with an approaching trial date and the prospect of having no witnesses, especially

Anderson, the key witness, to testify against Wallace, the PCPO held a meeting. The March 26,

2003 meeting included Del Russo, Freid, Sargent James Beatrice and Bonds, wherein the group

discussed the problems posed by Plaintiff's unwillingness to grant access to Anderson so that she

could be prepared to testify at trial and the entire family's non-cooperation and the possibility of

going to trial without Anderson, Malcolm or Wisdom as available witnesses. After reviewing the

case, a consensus decision was reached to charge Plaintiff with unlawful tampering with the

purpose to hinder the prosecution. Avigliano, however, was not present at the meeting. Further,

Avigliano stated that "he was not intimately involved with the criminal complaint lodged against

plaintiff." Avigliano also stated that "he was not consulted or involved with the decision making

process relative to the dismissal of the indictment and case against plaintiff." Further, Avigliano

stated that "he had no involvement in the matter known as State v. Claudette Hyatt."

Del Russo was the ranking official responsible for the decision to file charges against Plaintiff. After reviewing the case, Del Russo concluded that the charge was supported by probable cause. He believed that Plaintiff was deliberately undermining Wallace's prosecution because (1) she waited a month and a half after her seven-year old daughter informed her that she had been sexually abused and was suffering from a brown vaginal discharge before taking her to a doctor; (2) Plaintiff never reported the case to DYFS as required by law; (3) on several occasions, Plaintiff indicated her reluctance to assist with the prosecution of the case because of Wallace's relationship with the family; (4) after Dr. Agrawal referred Anderson's abuse to the PCPO and DYFS, Plaintiff exhibited a consistent lack of cooperation by refusing to return calls or respond to the authorities' visits; (5) Pastor Herbert, the family's pastor, told the PCPO that the family seemed more concerned about protecting Wallace than the children and said he did not believe that the family would be acting that way if it did not involve another family member, which Plaintiff herself later confirmed to be true at her deposition in this matter; and (6) Wallace was still permitted access to the house after the abuse was discovered and while he was a fugitive; no call was ever made to the PCPO to report his presence, despite a warrant being issued for his arrest.

The practical reality that the prosecution would fail unless Anderson, the key witness, was properly prepared for trial weighed heavily upon the decision to charge Plaintiff. Del Russo felt that, based on his training and experience, subjecting Anderson to an unfamiliar, uncomfortable and potentially hostile environment without prior acclimatization would not only be harmful to the prosecution's chances of success, but to Anderson herself.

On April 2, 2003, three PCPO representatives went to Plaintiff's workplace and advised her that she was required to accompany them to the PCPO's offices. Plaintiff alleges that she was "taken in handcuffs from her place of employment." At her deposition, however, Plaintiff admitted that she was not placed in handcuffs.

At the PCPO, several investigators spoke to Plaintiff, explained the PCPO's need to ensure Anderson's availability to testify and to prepare her for her testimony and advised Plaintiff that she would be charged with unlawful hindering if she continued to make Anderson unavailable. Plaintiff refused to alter the position she had taken in her previous interviews that she did not want her daughter to testify against her common law uncle. The PCPO charged her with unlawful tampering with the purpose to hinder the prosecution in violation of N.J. Stat. Ann. 2C:29-3(a)(3). That same day, the PCPO obtained a warrant for Plaintiff's arrest and bail was set in the amount of five thousand dollars. Plaintiff made bail twelve hours later and was released from custody.

On June 10, 2003, Del Russo presented the case against Plaintiff to a Grand Jury. After hearing the evidence, the Grand Jury returned an indictment. Plaintiff was arraigned on August 4, 2003. No motion to dismiss the indictment was ever made.

Because Plaintiff was a single parent, after her arrest, DYFS arranged for her two minor children, Anderson and Fabian, to stay with their uncle Christopher Howard Brown who, according to Plaintiff had previously cared for the children. Brown, acting as the children's custodian, brought Anderson to the PCPO to be prepared for trial and Anderson testified against Wallace.

8

### D.  Wallace's Conviction on Sexual Assault Charges and the Dismissal of the Charges Against Plaintiff

On April 9, 2003, a two-week jury trial commenced in State v. Wallace before the Hon. Gary Rothstadt, J.S.C. On the first day of trial, Plaintiff along with her attorney appeared with Anderson pursuant to subpoena and outside the presence of the jury advised the Court that she did not want Anderson to testify. Judge Rothstadt advised Plaintiff that Anderson would have to testify and the trial proceeded. The jury acquitted Wallace on five counts. None of the counts on which he was acquitted involved his abuse of Anderson. The jury was unable to reach a verdict regarding the counts involving Anderson. In September of 2003, those counts were retried and Anderson again testified at trial. The jury found Wallace guilty of the sexual assault of Anderson, endangering Anderson's welfare and one count of attempted endangering of Wisdom's welfare. On December 5, 2003, Wallace was sentenced to a six-year prison term. On March 28, 2007, after extended appellate review, the Superior Court of New Jersey, Appellate Division affirmed Wallace's conviction. The Supreme Court of New Jersey declined review by order dated June 21, 2007.

Following Wallace's conviction in September 2003, Del Russo decided to dismiss the indictment against Plaintiff after considering several factors: the PCPO had been able to prepare and present Anderson as a witness in the prosecution against Wallace and Wallace was now in custody where he could no longer endanger the minors in Plaintiff's household or anywhere else; Plaintiff had no prior criminal record and in Del Russo's judgment was no danger to society; in Del Russo's opinion, prosecutorial and judicial resources could be better utilized on other matters. Therefore, he requested that the Court dismiss the charges on September 29, 2003.

9

Seven months later, Plaintiff filed suit against Defendants.

**II.   S**TANDARD OF **R**EVIEW

      Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  The moving party bears the burden of showing that there is no genuine issue of fact.  See id.  "The burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party."  Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. See FED. R. CIV. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment."  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  However, "[i]n determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the nonmoving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp. 2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

III.   **D**ISCUSSION

A.    **The Eleventh Amendment**

The Eleventh Amendment to the Constitution of the United States provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

U.S. CONST. amend. XI.

While the Eleventh Amendment by its terms does not bar suits against a State by its own citizens, the Supreme Court has consistently held that an un-consenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state. See Edelman v. Jordan, 415 U.S. 651, 662-63 (1974); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 (1984). Further, the Eleventh Amendment precludes both claims brought for legal and equitable relief, as well as all those under §1983. See Pennhurst, 465 U.S. at 100-01. Reaffirming these principles, the Court in Quern v. Jordan stated:

§1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States. Nor does our reaffirmation of Edelman render §1983 meaningless insofar as States are concerned.

440 U.S. 332, 345 (1979). Expanding the Court's reasoning in Pennhurst to §1983, the Court in Will v. Michigan Dept. of State Police concluded:

While federal civil rights statute provides federal forum to remedy many deprivations of civil liberties, it does not provide federal forum for litigants who seek remedy against state for alleged deprivations of civil liberties; Eleventh Amendment bars such suits unless state has waived its immunity or

11

> Congress has exercised its undoubted power under §5 of Fourteenth
> Amendment to override that immunity.

491 U.S. 58, 66 (1989). As such, the Court reaffirmed <u>Quern</u>: "[W]e cannot conclude that §1983 was

intended to disregard the well-established immunity of a State from being sued without its consent."

<u>Will</u>, 491 U.S. at 67.

 The prosecutorial defendants in this case acted as agents of the State and are immune from

suit in federal court for any actions taken in their official capacities. Even though the State of New

Jersey is not a named party in this action, Plaintiff's suit may

nonetheless be barred by the Eleventh Amendment. <u>See</u> <u>Edelman</u>, 415 U.S. at 663. As the Court

espoused in <u>Ford Motor Co. v. Dept. of Treasury</u>, "when the action is in essence one for the recovery

of money from the state, the state is the real, substantial party in interest and is entitled to invoke its

sovereign immunity from suit even though individual officials are nominal defendants." 323 U.S.

459, 464 (1945).

 As such, the rule has evolved that a suit by private parties seeking to impose liability which

must be paid from public funds in the state treasury is barred by the Eleventh Amendment. <u>See</u>

<u>Edelman</u>, 415 U.S. at 663; <u>Carter v. City of Phila.</u>, 181 F.3d 339, 347 (3d Cir. 1999); <u>see also</u> <u>Fitchik</u>

<u>v. N.J. Transit Rail Operations, Inc.</u>, 873 F.2d 655, 659 (3d Cir. 1989). Therefore, when the state is

the real, substantial party in interest, the Eleventh Amendment bars a suit against state officials. <u>See</u>

<u>Ford Motor Co.</u>, 323 U.S. at 464. As when a State itself is named as the defendant, a suit against

state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or

injunctive relief. <u>See</u> <u>Cory v. White</u>, 457 U.S. 85, 91 (1982).

Furthermore, Defendants' tortuous actions, if any, were taken in their official capacity, as such, they cannot be considered "persons" subject to suit under 42 U.S.C. 1983. The Supreme Court in <u>Will</u> also addressed whether a State, or an official of the State while acting in his or her official capacity, is a "person" within the meaning of 42 U.S.C. §1983. The Court opined: "Neither a State nor its officials acting in their official capacities are "persons" under §1983." <u>Will</u>, 491 U.S. at 71. The Court reasoned:

> Obviously state officials literally are persons. But a suit against a state official in his or her  official  capacity  is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself.

<u>Id.</u> (citations omitted).

The Supreme Court reaffirmed this principle in <u>Hafer v. Melo</u>, holding that "an official capacity suit against a state officer is not a suit against the official but rather is a suit against the official's office," and as such, "is no different from a suit against the State itself." 502 U.S. 21, 26 (1991).

In the current case, all of the actions which form the basis of the Complaint were made by Defendants in their official capacities, despite Plaintiffs having pled that they are being sued in both their individual and official capacities. The state itself is the real party in interest. <u>See</u> <u>Wright v. State</u>, 169 N.J. 422, 462 (2001). Consequently, Plaintiffs' claims are barred by the Eleventh Amendment. <u>See</u> <u>Davis v. Twp. of Lakewood</u>, 2005 WL 1863665 (D.N.J. Aug. 4, 2005). Because an action under **§**1983 requires that an alleged deprivation was committed by a "person" acting under color of state law, Defendants are immune from suit under the Eleventh Amendment. Therefore, summary judgment is entered in favor of Defendants.

**B.**     **Absolute Immunity**

Prosecutors are absolutely immune for actions made within their prosecutorial function. See Imbler v. Pachtman, 424 U.S. 409 (1976). Absolute immunity extends to any and all alleged misdeeds, breaches or wrongdoing that a prosecutor is alleged to have committed in his or her prosecutorial capacity, including the decision to initiate a prosecution (see Kulwicki v. Dawson, 969 F.2d 1454, 1463 (3d Cir. 1992)); the obtaining, reviewing and evaluation of evidence needed to present a case (see Schrob v. Catterson, 948 F.2d 1402, 1414 (3d Cir. 1991)); and the handling of pre-trial matters such as grand jury proceedings and probable cause hearings. See Michaels v. State of N.J., 222 F.3d 118, 123 (3d Cir. 2000). Absolute immunity also extends to investigators employed by a prosecutor's office who "secure information relating to the prosecution of an accused." Davis v. Grusemeyer, 996 F.2d 617, 631 (3d Cir. 1993).

In the landmark decision in Imbler v. Pachtman, the Supreme Court of the United States articulated the doctrinal underpinnings of absolute prosecutorial immunity:

> The common law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.

424 U.S. 409, 422-23 (1976). The Court articulated that prosecutorial immunity should be utilized to dispose of lawsuits prior to trial in order to avoid diverting a prosecutor's office's limited resources to defending civil actions. The Court wrote:

> The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential

14

> liability in a suit for damages. Such suits could be expected with some frequency, for a Defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate . . . Further, if the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law
>
> .

Id. at 424-26.

Absolute prosecutorial immunity is necessary in the current case. The PCPO, by any measure, faced a difficult situation when presented with Plaintiff's refusal to grant access to a young child who was victimized by a serial sex offender. The PCPO had sufficient evidence to reasonably suspect that Plaintiff was hindering the purpose of Wallace's prosecution. Plaintiff initially failed to report the case to DYFS as required by law, (see N.J. Stat. Ann. 9:6-8.10), she was non-responsive and evasive after the abuse came to light, she said she would not allow her child to be prepared to testify in court and she appeared to remain *incommunicado* as the trial date approached. Therefore, the charging decision falls within prosecutorial immunity and cannot be made the subject of a retaliatory civil action.

Defendants are similarly not liable for their investigative conduct. First, the conduct that forms the basis of Plaintiff's claims is prosecutorial in nature and not investigative. The Complaint alleges that she was mis-charged, not "mis-investigated." See Rose v. Bartle, 871 F.2d 331, 345 (3d Cir. 1989). Second, based on Plaintiff's repeated resistance to the PCPO's efforts to gain access to Anderson, the PCPO had probable cause to believe that she was hindering Wallace's prosecution. See Michaels, 50 F. Supp. 2d at 359-60; Lind v. Schmid, 67 N.J. 255, 263 (1975). For both of these reasons, *all* of the actions for which Plaintiff complains fall on the prosecutorial side of the prosecutorial/investigative divide and are, therefore, shielded by

absolute immunity. See Michaels v. State of N.J., 222 F.3d 118, 123 (3d Cir. 2000); Davis v. Grusemeyer, 996 F.2d 617, 631 (3d Cir. 1993).

   **C.    Qualified Immunity**

   In addition to enjoying absolute immunity from suit under Imbler and its progeny, Defendants are also entitled to summary judgment under the qualified immunity standards of Harlow v. Fitzgerald. See 457 U.S. 800 (1982). Under those standards, which were developed specifically to facilitate the review and disposition of cases by summary judgment, public officials are shielded from suit if their conduct was objectively reasonable and not in violation of clearly established law. See id. at 818-19; see also Anderson v. Creighton, 483 U.S. 635, 639 (1987); Malley v. Briggs, 475 U.S. 335, 341 (1986).

   Qualified immunity shares one important attribute with absolute prosecutorial immunity: it is an immunity from suit, rather than a mere defense to liability, so it is designed to avoid subjecting public officials to the burdens and risks of trial. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The Supreme Court of the United States has gone so far as to state that qualified immunity "is an entitlement not to stand trial or face the other burdens of litigation" and "like an absolute immunity . . . is effectively lost if a case is erroneously permitted to go to trial." Id. at 526; see also Hunter v. Bryant, 502 U.S. 224, 227 (1991). Qualified immunity reflects a balance between individual constitutional rights and the societal interest to protect government officials from the expenses of litigation, the diversion of official energy from pressing public issues and the deterrence of able citizens from acceptance of public office. See Harlow, 457 U.S. at 814. To those ends, the Harlow test "permits courts to weed out suits which fail the test without requiring

16

a Defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." Siegert v. Gilley, 500 U.S. 226, 232 (1991).

In cases like the current case which involve questions of probable cause, qualified immunity applies as long as reasonable law enforcement officials might disagree as to whether probable cause existed. See Malley, 475 U.S. at 341; Hunter, 502 U.S. at 228. Here, the record establishes the objective reasonableness of Defendants' actions beyond any material factual dispute. When the PCPO was advised that Wallace had sexually abused Anderson and other minors in Plaintiff's household, it was obligated to open and pursue an investigation. The investigation led to a grand jury indictment against Wallace. From the outset of the investigation, Plaintiff engaged in conduct that gave rise to a reasonable belief that she was working to subvert Wallace's prosecution: she refused to return calls, she refused to respond to a hand-delivered letter and, when interviewed, she indicated that she did not want her child to testify. Faced with the prospect of having no witnesses to testify against a serial sex offender, the PCPO took reasonable steps to prevent Plaintiff from thwarting justice and subjecting her child to further predations. Moreover, Plaintiff validated the PCPO's judgment by seeking to avoid having Anderson testify at the commencement of the Wallace trial.

The sequence of events which led Defendants to file charges against Plaintiff is well-documented and establishes the objective reasonableness of their actions as a matter of law. See Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).

Defendants are entitled to qualified immunity because they were entitled to act in the exercise of their judgment and lawful discretion in charging Plaintiff. See McLaughlin v.

Watson, 271 F.3d 566, 572 (3d Cir. 2001); see also In re City of Phila. Litigation, 49 F.3d 945, 961 (3d Cir. 1995). Under the summary judgment standards and the well-settled notion that qualified immunity should be applied to dispose of all claims brought against public officials, except where the facts bespeak utter incompetence or knowing violation of the law, Defendants are entitled to judgment and dismissal of the Complaint with prejudice. See Mitchell v. Forsyth, 472 U.S. 511 (1985).

Furthermore, Avigliano is entitled to immunity because he did not have any personal involvement in the decision to charge and prosecute Plaintiff and did not proximately cause any of the injuries for which Plaintiff complains.

In Hampton v. Holmesburg Prison Officials, the Third Circuit recognized: "In section 1983 suits liability may not be imposed on the traditional standards of *respondeat superior*." 546 F.2d 1077, 1082 (3d Cir. 1976). In Rode v. Dellarciprete, the Court reaffirmed this principle, finding that "a defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." 845 F.2d 1195, 1207-08 (1988). As such, the Courts in Hampton and Rode awarded summary judgment to the supervisory officials who were not involved in any of the complained-of actions. Furthermore, "a supervisory official cannot be held liable if that defendant's conduct was not a proximate cause of the alleged civil rights deprivation. Section 1983 imposes liability only upon those who actually cause a deprivation of rights." See Malley v. Briggs, 475 U.S. 335, 341 (1986).

18

In this case, Plaintiff has not established that Avigliano had any involvement in the decision to charge and prosecute her, nor has she put forth any evidence to establish that Avigliano deprived her of a federally protected right. In her answers to Avigliano's interrogatories, Plaintiff admits that she never spoke to Avigliano. In fact, the record establishes that the decision to charge Hyatt was Del Russo's and that neither he, Fried, Bonds nor Henriquez spoke to Avigliano about the decision. Avigliano was never consulted on the decisions to charge, prosecute and dismiss the charges against Plaintiff, nor was he privy to meeting held among the Defendants on March 26, 2003. Therefore, Plaintiff cannot establish that Avigliano had any personal involvement in the deprivation of her civil rights or that he proximately caused her injuries. Plaintiffs' §1983 suit against Avigliano is based solely on a theory of *respondeat superior* and is, thus, improper under <u>Malley</u> and <u>Rode</u>.

Also, County of Passaic cannot be held vicariously liable. In New Jersey, courts have long recognized the principle that "when county prosecutors execute their sworn duties to enforce the law by making use of all the tools lawfully available to them to combat crime, they act as agents of the State." <u>Wright</u>, 169 N.J. at 462. In New Jersey, "a county prosecutor's law enforcement function is unsupervised by county government or any other agency of local government, but remains at all times subject to the supervision and supersession power of the Attorney General." <u>Id.</u> at 461-62. As such, in this case, the prosecutorial defendants acted as "agents of the State" at the time of their alleged wrongful conduct and the County of Passaic cannot be held vicariously liable for their actions.

In Cashen, a former criminal defendant brought a civil action for damages against the County of Morris, its prosecutor and several police officers because of an allegedly illegal search of Plaintiff's home. As such, the New Jersey Supreme Court examined the relationship between county prosecutors and the State. The Court held, "in the context of this case, the prosecutor and the detectives are to be considered agents of the State and not the county. A county could not be held liable for the actions of the county prosecutor and his detectives when their tortuous conduct arose out of the investigation of criminal activity." Cashen, 66 N.J. at 552.

Similarly, in Coleman, a former employee in the Monmouth County Prosecutor's Office brought a sex discrimination action against the county prosecutor, prosecutor's office and County of Monmouth. As such, the Third Circuit examined whether the County of Monmouth could be held vicariously liable for the county prosecutor's actions. The Court opined:

> A review of related authorities leads us to conclude that county prosecutors in New Jersey can be characterized as having a dual or hybrid status. It is well established that when county prosecutors execute their sworn duties to enforce the law by making use of all the tools lawfully available to them to combat crime, they act as agents of the State. On the other hand, when county prosecutors are called upon to perform administrative tasks unrelated to their strictly prosecutorial functions, such as a decision whether to promote an investigator, the county prosecutor in effect acts on behalf of the county that is the situs of his or her office.

Coleman, 87 F.3d at 1499.

Ultimately, the Court characterized the prosecutor in Coleman as a "county official" only "because his tortuous conduct arose out of an employment decision and not execution of his sworn duties to combat crime." Id. at 1502. Had the latter been true, "the prosecutor would have been considered an agent of the State and the plaintiff would not have had a cognizable claim

20

against the County of Monmouth." Id. at 1499.

Finally, in Michaels, a nursery school teacher brought a §1983 and malicious prosecution action under New Jersey law against a former county prosecutor, three assistant prosecutors, a county investigator, Essex County and the State of New Jersey. See 968 F. Supp. at 236. Relying on the holdings of Cashen and Coleman, the Court concluded:

> So long as the prosecutorial defendants in this case were 'investigat[ing] criminal activity' or 'executing their sworn duties to enforce the law by making use of all the tools lawfully available to them to combat crime,' the County cannot be vicariously liable under New Jersey law for any claims arising therefrom . . . the prosecutorial defendants 'were executing their sworn duties to enforce the laws when they participated in the investigation [and] prosecution that form the basis of plaintiff's claims.' Plaintiff's claim against the County, therefore, falls squarely within the rule espoused in Cashen, leaving her without any cognizable claim, at least under New Jersey law, against the County.

Michaels, 968 F. Supp at 233 (quotations in original).

Here, as in Cashen and Michaels, Plaintiff brings malicious prosecution, false arrest and §1983 claims against county prosecutors, PCPO and County of Passaic. Each Defendant's actions were taken in their official capacities. Each Defendant's violations, if any, arose out of the execution of their sworn duties to enforce the law using all the tools lawfully available to them to combat crime. Unlike the prosecutor in Coleman who was considered a "county official" only because he made an "administrative" decision, in this case, Avigliano is not a "county official" because Defendants' decision to charge Plaintiff was not "unrelated to their strictly prosecutorial functions. Rather, their decision arose-out of the investigation of criminal activity and execution of their sworn duties to combat crime. Therefore, under Cashen and Michaels, Defendants acted as agents of the State, so the County of Passaic cannot be held vicariously

21

liable for those actions.

### D.    Plaintiffs' Claims Fail or are Refuted by the Motion Record

#### 1.    Malicious Prosecution

> In Morales v. Busbee, the court set-forth the elements for a malicious
> prosecution claim: (1) the Defendant has initiated a criminal proceeding; (2)
> the proceeding ends in plaintiff's favor; (3) the proceeding was initiated
> without probable cause; and (4) the Defendant acts maliciously or for a
> purpose other than bringing the Defendants to justice.

972 F. Supp. 254, 261 (D.N.J. 1997). Here, Plaintiffs cannot show a lack of probable cause or

actual malice on the part of any of the moving Defendants. With respect to probable cause,

Defendants' actions clearly satisfy the standard articulated by the Third Circuit in Orsatti v. N.J.

State Police:

> Probable cause to arrest requires more than mere suspicion; however, it does
> not require that the office have evidence sufficient to prove guilt beyond a
> reasonable doubt. Rather, probable cause to arrest exists when the facts and
> circumstances within the arresting officers' knowledge are sufficient in
> themselves to warrant a reasonable person to believe that an offense has been
> or is being committed by the person to be arrested.

71 F.3d at 483 (internal citations omitted). Defendants had sufficient cause to charge her in light

of Plaintiff's initial failure to report her daughter's sexual abuse to the authorities, her stated

reluctance to assist the prosecution of the case because of Wallace's relationship with the family,

her general non-responsiveness and uncooperativeness with the PCPO and DYFS, her tolerance

of Wallace returning to the family home while he was a fugitive and her emphatic refusal to

allow Anderson to be prepared for trial or testify at trial. On the established facts of the record,

Plaintiffs cannot raise a triable issue as to the existence of probable cause. Therefore, no rational

juror could conclude that Defendants acted maliciously in electing to file charges against

Plaintiff. The record is devoid of any suggestion that Defendants acted with personal animus toward Plaintiff or in reckless disregard of a known fact. Conversely, the record establishes, beyond any material dispute, that Defendants properly exercised their prosecutorial duties in filing and ultimately dismissing charges against Plaintiff. Accordingly, summary judgment is entered in favor of Defendants.

### 2.    False Arrest and False Imprisonment

False arrest and false imprisonment claims accrue at the time of the arrest and imprisonment. See, e.g., Bauer v. Borough of Cliffside Park, 225 N.J. Super. 38, 47 (App. Div. 1988). Conversely, malicious prosecution claims accrue only upon the resolution of the criminal charges in the plaintiff's favor. See Heck v. Humphrey, 512 U.S. 477, 484 (1994).

Under the New Jersey Tort Claims Act, a claimant generally must file a notice of claim within ninety-days after the accrual of a cause of action. See N.J. Stat. Ann. 59:8-8. If a claimant fails to file a timely notice of claim, he or she may seek leave of court to file, provided the motion seeking such leave is filed "within one year after the accrual of his claim." Id. The filing of a notice of claim outside of the ninety-day period without leave of court is a nullity. See Priore v. State, 190 N.J. Super. 127, 130 (App. Div. 1983), rev'd on other grounds, 182 N.J. 507 (2005). Here, Plaintiff was arrested on April 2, 2003 and she filed a Notice of Claim on December 26, 2003 without seeking leave of court. At no time thereafter did Plaintiff seek leave of court to file a Notice of Claim. Accordingly, by direct operation of the Tort Claims Act, her false arrest and false imprisonment claims are now "forever barred." N.J. Stat. Ann. 59:8-8.

Furthermore**,** as with malicious prosecution, the existence of probable cause is a complete defense to a false arrest or false imprisonment claim. See Santiago v. City of Vineland, 107 F. Supp. 2d 512, 561 (D.N.J. 2000); Green v. City of Paterson, 971 F. Supp. 891, 909 (D.N.J. 1997). The record establishes, beyond any material dispute of fact, that Defendants acted with probable cause in filing charges against Plaintiff.

### 4.   Damages for Emotional Distress Under the New Jersey Tort Claims Act

As a limiting constraint on actions brought against public entities and public employees in New Jersey:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3600.

N.J. Stat. Ann. 59:9-2(d). This constraint on awards for pain and suffering reflects the policy judgment that public entities should not be subjected to unlimited exposure for emotional distress damages, except where objective indicia demonstrate that a severe physical injury has occurred. The limitation applies to all actions brought under the Tort Claims Act. See Delacruz v. Borough of Hillsdale, 183 N.J. 149, 164-65 (2005); see also Brooks v. Odom, 150 N.J. 395 (1997). Here, it is not alleged that any of Plaintiffs suffered any "loss of a bodily function, permanent disfigurement or dismemberment." Therefore, they fail to meet the threshold requirements for emotional distress damages under the Tort Claims Act.

**5.** **Plaintiffs' State Law Claims Against Defendant Henriquez**

Before filing any tort action under state law against a public entity or public employee in New Jersey, a claimant must file a pre-suit notice of claim. <u>See</u> N.J. Stat. Ann. 59:8-8. Here, Plaintiffs' Notice of Claim failed to name Henriquez as a potential Defendant. Therefore, all claims brought under state law against Henriquez must be dismissed. <u>See</u> <u>Priore</u>, 190 N.J. Super. at 130. Moreover, Plaintiffs have also failed, on the merits, to show any reason why Henriquez has been named as a Defendant. Henriquez's involvement in the case was limited to taking the initial call from the Great Falls Pediatric Clinic and acting as a liaison between DYFS and the PCPO.

**IV.**   CONCLUSION

For the reasons stated, it is the finding of this Court that Defendants PCPO, Del Russo, Freid, Bonds and Henriquez's motion for summary judgment is **granted**; and Defendants Avigliano and County of Passaic's cross-motion for summary judgment is **granted**. An appropriate Order accompanies this Opinion.


_____     Dennis M. Cavanaugh
_____     Dennis M. Cavanaugh, U.S.D.J.

Date:        March 24, 2008
Orig.:       Clerk
cc:          All Counsel of Record
             Hon. Mark Falk, U.S.M.J.
             File