NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CLAUDETTE HYATT, *et al.*, | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | **OPINION** |
| v. | Civil Action No. 04-CV-1545 (DMC) |
| COUNTY OF PASSAIC, *et al.*, |  |
| Defendants. |  |

DENNIS M. CAVANAUGH, U.S.D.J.:

      This matter comes before the Court upon Plaintiff Claudette Hyatt's ("Plaintiff") motion for reconsideration of this Court's decision granting Defendant Passaic County Prosecutor's Office ("PCPO"), Chief Assistant Prosecutor Joseph Del Russo ("Del Russo"), Assistant Prosecutor Christopher Freid ("Freid"), Detective Susan Bonds ("Bonds"), James Avigliano ("Avigliano") and Giselle Henriquez's ("Henriquez," collectively "Defendants") motion for summary judgement pursuant to L. Civ. R. 7.1(i). Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Plaintiff's motion for reconsideration is **denied**.

I.     **BACKGROUND**[1]

A.     Precipitating Events

On June 15, 2001, Plaintiff took her seven-year old daughter, Alicia Anderson ("Anderson"), and her seventeen-year old daughter, Glenise Malcolm ("Malcolm"), to the Great Falls Pediatric Clinic. Staff members referred Anderson to Dr. Nina Agrawal ("Dr. Agrawal"), a pediatrician who specializes in child abuse. Plaintiff reported to Dr. Agrawal that Anderson had been suffering from a brown vaginal discharge for a couple of months, she was experiencing difficulties at school and was acting withdrawn and angry. Dr. Agrawal suspected sexual abuse. In response to direct questioning, Anderson advised Dr. Agrawal that Lavoisier Wallace ("Wallace"), her common law uncle and a member of her household,[2] had been touching her "on her private part with [his] private part under her clothes." Malcolm, Plaintiff's other daughter, also advised that Wallace had abused her. Plaintiff told Dr. Agrawal that she was reluctant to report her daughter's abuse because of Wallace's relationship with the family.

The pediatric clinic promptly referred the case to the PCPO's Child Abuse Unit, which is led by Del Russo. The PCPO opened an investigative file, to which it assigned Detective James Arnold ("Arnold"). Arnold immediately and repeatedly tried to call and left messages for Plaintiff, but his efforts were all to no avail.

---

[1] The facts set forth in this Opinion are taken from the facts set forth in the Parties' FED. R. CIV. P. 56.1 statements in their respective moving papers.

[2] Plaintiff's household included her mother (Louise); her sister Andrea and her two minor children by Wallace, Michael and Maxine, and Wallace himself; her sister Juliet and her four children, all minors, Telicia, Tiffany, Tameka and Anthony and Plaintiff's three children, Anderson, Fabian (sometimes referred to as Andrew) and Glenise.

On June 21, Arnold went to Plaintiff's residence and spoke with Malcolm. Arnold left his card with her, along with a letter addressed to Plaintiff requesting that she contact him. On June 22, he called her again, but still received no return call. On June 25, he returned to the Hyatt residence and finally managed to find Plaintiff. Arnold explained that the PCPO needed to interview her and her children, so they scheduled a June 29 interview at the PCPO's Child Advocacy Center.

On June 29, Rachel Heath ("Heath"), a Child Interview Specialist employed by the PCPO, interviewed Plaintiff and Anderson and recorded the session on videotape. When asked whether Wallace ever put his private part on or in her mouth, Anderson responded that he would "open my mouth and put it in" getting "hair" in her mouth. When asked if Wallace ever touched her with his hand, Anderson responded that he touched her on her private part "on and inside." He threatened to hurt her by "slamming her on the floor" and "punching her" if she told anyone. These events occurred on multiple occasions in her Aunt's bedroom and in her grandmother's bedroom while no other adults were home.

As Heath was interviewing Anderson, Arnold interviewed Malcolm, who advised him that she caught Wallace sexually assaulting Wisdom, Malcolm's fifteen-year old cousin, several months earlier at the Hyatt residence. Malcolm also told Arnold that Wallace had abused her when she was younger. Arnold then interviewed Plaintiff, at which point Plaintiff told Arnold that she had learned of Wallace's assault on Wisdom on April 28, 2001, the night it occurred, and discovered a few weeks later that Wallace had been abusing Anderson.[3] When asked, Plaintiff

---

[3] From Plaintiff's statement to Detective Arnold, it is apparent that Plaintiff waited until June 15, 2001 – more than a month after first learning of Anderson's abuse by Wallace – to have her treated by a doctor.

3

stated that she was unaware of Wallace's whereabouts but that she thought he might have relocated to New York. Plaintiff also told Arnold that she was being pressured by her family not to cooperate with the investigation. Arnold's ensuing attempts to reach Plaintiff's sister, Andrea Hyatt, to procure information regarding Wallace's whereabouts were equally unsuccessful.

As the PCPO was continuing its investigative efforts, the Division of Youth and Family Services ("DYFS") was conducting a parallel investigation with similar resistance from the family. DYFS caseworker Carlene Clyburn ("Clyburn") was unable to speak with the children until August 15 – two full months after Dr. Agrawal's referral – despite repeated attempts to contact the family. During the DYFS interview, Anderson told Clyburn that Wallace had touched her inappropriately on numerous occasions, that he threatened to choke or punch her if she told anyone and that he still visited the household regularly to pick-up his children, Michael and Maxine. While Clyburn was interviewing Anderson, another DYFS caseworker and Arnold interviewed Wisdom, who was then fifteen-years old. Wisdom told them that Wallace had once "touched her butt," but indicated that she did not want to cooperate with the investigation.[4]

    B.    <u>Wallace's Arrest and Prosecution for Sexual Assault</u>

On September 10, 2001, Arnold filed a criminal complaint against Wallace. A warrant issued, but the PCPO was unable to make an arrest because of a lack of information regarding Wallace's whereabouts. In April 2002, with Wallace still at large, Assistant Prosecutor Christopher Freid presented the case against Wallace to a Passaic County Grand Jury. After hearing the evidence, the Grand Jury indicted Wallace on nine counts, including aggravated

---

[4] In a later statement, given in November 2001, Wisdom reported that Wallace had been molesting her since she was eleven-years old. During that interview, Wisdom's mother (Plaintiff's sister Juliet) stated that she did not want to involve herself or her daughter in the matter because of Wallace's relationship with the family.

4

sexual assault, sexual assault and endangering Anderson's welfare; aggravated sexual assault, sexual assault and endangering Malcolm's welfare; and attempted sexual assault, aggravated sexual assault and attempted endangering Wisdom's welfare.

In May 2002, Wallace appeared for his arraignment accompanied by his attorney, Joseph Collini, Esq. ("Collini"). As the criminal case proceeded, Wallace refused a plea agreement. Freid felt that Wallace knew that the victims' family did not want to see him prosecuted and that they would not participate or cooperate in the prosecution, so Wallace believed that he would be acquitted at trial.

The criminal case against Wallace was set for trial in early April 2003. In late February, Detective Aliano ("Aliano"), the PCPO detective then responsible for assisting Freid, began trying to contact witnesses. Plaintiff's mother, Louise, advised him that Plaintiff had moved and refused to tell him where: "If you are the police, then you can find that out on your own," she told Aliano. Plaintiff's sister Juliet was equally unhelpful. She told Aliano, as she had told Arnold before, that she did not want her daughter to testify against Wallace and that she wanted the charges to be dropped. When asked where Plaintiff was living, Juliet offered a vague response that she lived "somewhere on 27th Street in Paterson" and said that she would "rather not" provide a telephone number.

On March 12, 2003, the PCPO received a call from Juliet and the family's pastor, Barrington Hibbert ("Hibbert"). They said they would come in with Plaintiff for a meeting with Freid on March 14, but they would not bring the children. At the ensuing meeting, Freid explained to Plaintiff and Juliet that he needed to meet with their children to familiarize them with the staff, courtroom and proceedings that would be taking place. He further advised them

5

that if the children were not properly prepared to testify, they would not be effective witnesses at trial and there was a good chance that Wallace would be acquitted. He also told them about his belief that Wallace would not entertain a plea offer because he believed the children would never testify against him at trial. Plaintiff and Juliet advised Freid that "their position remained the same and they would not bring their children to this office to speak to us nor did they want their children to testify at the trial." Following the meeting, the PCPO left several telephone messages for Plaintiff and Juliet. Juliet called back twice and stated that she would not make Wisdom available to testify. She told Bonds that she was not concerned about being arrested. Plaintiff never returned any telephone calls.

    C.    <u>Plaintiff's Arrest</u>

Faced with an approaching trial date and the prospect of having no witnesses, especially Anderson, the key witness, to testify against Wallace, the PCPO held a meeting. The March 26, 2003 meeting included Del Russo, Freid, Sargent James Beatrice ("Beatrice") and Bonds, wherein the group discussed the problems posed by Plaintiff's unwillingness to grant access to Anderson so that she could be prepared to testify at trial and the entire family's non-cooperation and the possibility of going to trial without Anderson, Malcolm or Wisdom as available witnesses. After reviewing the case, a consensus decision was reached to charge Plaintiff with unlawful tampering with the purpose to hinder the prosecution. Avigliano, however, was not present at the meeting. Further, Avigliano stated that "he was not intimately involved with the criminal complaint lodged against plaintiff." Avigliano also stated that "he was not consulted or involved with the decision making process relative to the dismissal of the indictment and case against plaintiff." Further, Avigliano stated that "he had no involvement in the matter known as

6

State v. Claudette Hyatt."

Del Russo was the ranking official responsible for the decision to file charges against Plaintiff. After reviewing the case, Del Russo concluded that the charge was supported by probable cause. He believed that Plaintiff was deliberately undermining Wallace's prosecution because (1) she waited a month and a half after her seven-year old daughter informed her that she had been sexually abused and was suffering from a brown vaginal discharge before taking her to a doctor; (2) Plaintiff never reported the case to DYFS as required by law; (3) on several occasions, Plaintiff indicated her reluctance to assist with the prosecution of the case because of Wallace's relationship with the family; (4) after Dr. Agrawal referred Anderson's abuse to the PCPO and DYFS, Plaintiff exhibited a consistent lack of cooperation by refusing to return calls or respond to the authorities' visits; (5) Hibbert, told the PCPO that the family seemed more concerned about protecting Wallace than the children and said he did not believe that the family would be acting that way if it did not involve another family member, which Plaintiff herself later confirmed to be true at her deposition in this matter; and (6) Wallace was still permitted access to the house after the abuse was discovered and while he was a fugitive; no call was ever made to the PCPO to report his presence, despite a warrant being issued for his arrest.

The practical reality that the prosecution would fail unless Anderson, the key witness, was properly prepared for trial weighed heavily upon the decision to charge Plaintiff. Del Russo felt that, based on his training and experience, subjecting Anderson to an unfamiliar, uncomfortable and potentially hostile environment without prior acclimatization would not only be harmful to the prosecution's chances of success, but to Anderson herself.

On April 2, 2003, three PCPO representatives went to Plaintiff's workplace and advised

her that she was required to accompany them to the PCPO's offices. Plaintiff alleges that she was "taken in handcuffs from her place of employment." At her deposition, however, Plaintiff admitted that she was not placed in handcuffs.

At the PCPO, several investigators spoke to Plaintiff, explained the PCPO's need to ensure Anderson's availability to testify and to prepare her for her testimony and advised Plaintiff that she would be charged with unlawful hindering if she continued to make Anderson unavailable. Plaintiff refused to alter the position she had taken in her previous interviews that she did not want her daughter to testify against her common law uncle. The PCPO charged her with unlawful tampering with the purpose to hinder the prosecution in violation of N.J. Stat. Ann. 2C:29-3(a)(3). That same day, the PCPO obtained a warrant for Plaintiff's arrest and bail was set in the amount of five thousand dollars. Plaintiff made bail twelve hours later and was released from custody.

On June 10, 2003, Del Russo presented the case against Plaintiff to a Grand Jury. After hearing the evidence, the Grand Jury returned an indictment. Plaintiff was arraigned on August 4, 2003. No motion to dismiss the indictment was ever made.

Because Plaintiff was a single parent, after her arrest, DYFS arranged for her two minor children, Anderson and Fabian, to stay with their uncle Christopher Howard Brown ("Brown") who, according to Plaintiff had previously cared for the children. Brown, acting as the children's custodian, brought Anderson to the PCPO to be prepared for trial and Anderson testified against Wallace.

      D.     <u>Wallace's Conviction on Sexual Assault Charges and the Dismissal of the Charges Against Plaintiff</u>

On April 9, 2003, a two-week jury trial commenced in <u>State v. Wallace</u> before the Hon. Gary Rothstadt, J.S.C. ("Judge Rothstadt"). On the first day of trial, Plaintiff along with her attorney appeared with Anderson pursuant to subpoena and outside the presence of the jury advised the Court that she did not want Anderson to testify. Judge Rothstadt advised Plaintiff that Anderson would have to testify and the trial proceeded. The jury acquitted Wallace on five counts. None of the counts on which he was acquitted involved his abuse of Anderson. The jury was unable to reach a verdict regarding the counts involving Anderson. In September of 2003, those counts were retried and Anderson again testified at trial. The jury found Wallace guilty of the sexual assault of Anderson, endangering Anderson's welfare and one count of attempted endangering of Wisdom's welfare. On December 5, 2003, Wallace was sentenced to a six-year prison term. On March 28, 2007, after extended appellate review, the Superior Court of New Jersey, Appellate Division affirmed Wallace's conviction. The Supreme Court of New Jersey declined review by order dated June 21, 2007.

Following Wallace's conviction in September 2003, Del Russo decided to dismiss the indictment against Plaintiff after considering several factors: the PCPO had been able to prepare and present Anderson as a witness in the prosecution against Wallace and Wallace was now in custody where he could no longer endanger the minors in Plaintiff's household or anywhere else; Plaintiff had no prior criminal record and in Del Russo's judgment was no danger to society; in Del Russo's opinion, prosecutorial and judicial resources could be better utilized on other matters. Therefore, he requested that the Court dismiss the charges on September 29, 2003.

Seven months later, Plaintiff filed suit against Defendants. On March 27, 2008, this Court granted Defendants' motion for summary judgement. On April 10, 2008, Plaintiff filed motion for reconsideration of the Court's Order granting Defendants' motion for summary judgement. Plaintiff filed motion for reconsideration improperly pursuant to L. Civ. R. 7.1(g); Courtesy Copies. "The plaintiffs move under R. 7.1(g) for a reargument of the Court's Opinion in which defendants' motion for summary judgement were granted on March 27, 2008. Plaintiffs move for reconsideration and oral argument on the Court's granting of defendants' summary judgement motions." (Plaintiff's Motion at 2). The Court will now consider Plaintiff's motion for reconsideration pursuant to L. Civ. R. 7.1(i); Motions for Reconsideration.

## II.     STANDARD OF REVIEW

Fed. R. Civ. P. 59(e) permits a plaintiff to move to alter a judgement within ten days of entry of an order. See Fed. R. Civ. P. 59(e). L. Civ. R. 7.1(i) governs motions for reconsideration for the United States District Court, District of New Jersey. See United States v. Compaction Sys. Corp., 88 F. Supp. 2d 339, 345 (D.N.J. 1999). A motion for reconsideration must present (1) an intervening change in the controlling law; (2) new evidence not previously available; or (3) a clear error of law or manifest injustice. See Database Am., Inc. v. Bellsouth Adver. & Publ'g. Corp., 825 F. Supp. 1216, 1220 (D.N.J. 1993). "A motion for reconsideration is not a vehicle to reargue the motion or to present evidence which should have been raised before." Id. Disagreement with the Court's decision should be raised through the appellate process. L. Civ. R. 7.1(i) is not meant to allow the losing party to supplement their brief on issues previously presented in the original motion. See Polizzi Meats, Inc. v. Aetna Life & Cas. Co., 931 F. Supp. 328, 339 (D.N.J. 1996). L. Civ. R. 7.1(i) requires a party set forth concise

issues the Court is believed to have overlooked.  See Damiano v. Sony Music Entm't., Inc., 975 F. Supp. 623, 634 (D.N.J. 1996).  Reconsideration is an "extraordinary remedy" to be granted "sparingly."  See NL Indus., Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996).

### III.   DISCUSSION

Plaintiff has not demonstrated any change in controlling law, brought forth previously unavailable evidence or identified a clear error of law or manifest injustice.  Plaintiff's mere recapitulation of arguments and case law previously entertained by this Court does not satisfy the requirement for a motion for reconsideration. See G-69 v. Degnan, 748 F. Supp. 274, 275 (D.N.J. 1990).  For these reasons, Plaintiff's motion for reconsideration is denied**.**

#### A.   Change in Controlling Law and Previously Unavailable Evidence

Plaintiff fails to present an  intervening change in the controlling law that would affect the outcome of Plaintiff's claims.  Plaintiff also fails to set forth evidence previously unavailable at the time of Plaintiff's opposition to Defendants' motion for summary judgement.  This Court has, in great detail, summarized the background of Plaintiff's case.  This Court has undoubtably considered and thoroughly reviewed all salient facts.

#### B.   Clear Error of Law or Manifest Injustice

Plaintiff's motion for reconsideration offers the same legal arguments and case law that this Court previously considered.  Plaintiff fails to demonstrate to this Court that there exists a clear error of law or manifest injustice.  See Database, 825 F. Supp. at 1220.  Rather, Plaintiff alleges that this Court has not dealt with several issues contained in Plaintiff's original opposition to Defendants' motion for summary judgment.  Conversely, this Court has analyzed

each legal claim raised by both parties and issued an Opinion that addresses each count contained in Plaintiff's Complaint. The restatement of previously considered arguments fails to satisfy the requirement for a motion for reconsideration. See G-69, 748 F. Supp. at 275.

        1.       Eleventh Amendment

Plaintiff argues this Court failed to address the State of New Jersey's waiver, Defendants' alleged administrative capacity and Defendants' unique "hybrid" status. A state can only waive Eleventh Amendment immunity through the "most express language or by such overwhelming implication from the text as will leave no room for any other reasonable conclusion." Port Auth. Trans-Hudson Corp. v Feeney, 495 U.S. 299, 305 (1990). Furthermore, this Court has resolved these issues, holding that Defendants acted in their official capacities in all actions that form the basis of Plaintiff's Complaint. Thus, Defendants cannot be considered "persons" subject to suit under 42 § U.S.C. 1983. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). As in Hafer v. Melo the Supreme Court of the United States held that, to allow a suit against an officer of the state acting within an official capacity "is no different from a suit against the State itself." 502 U.S. 21, 26 (1991).

Plaintiff has failed to express "any factual or legal matters that, if overlooked, might reasonably have resulted in a different conclusion." Merrill Lynch Bus. Fin., Inc. v. Kupperman, 2007 WL 4287684 (D.N.J. 2007).

        2.       Absolute Immunity

Plaintiff argues that this Court failed to address Defendants' alleged administrative and investigative functions as well as, the Supreme Court of the United State's decision in Monell v. Dep't of Soc. Serv. of City of New York. See 436 U.S. 658 (1978). Plaintiff fails to set forth an

argument not previously considered by this Court. This Court held that Defendants' conduct which forms the basis of Plaintiff's Complaint is prosecutorial in nature and not investigative. Thus, absolute prosecutorial immunity is necessary in Defendants' case because prosecutors are absolutely immune for actions made within their prosecutorial function. See Imbler v. Pachtman, 424 U.S. 409 (1976). Furthermore, this Court held that all of the actions for which Plaintiff complains fall on the prosecutorial side of the prosecutorial/investigative divide and are, therefore shielded by absolute immunity. See Michaels v. New Jersey, 222 F.3d 118, 123 (3d Cir. 2000); Davis v. Grusemeyer, 996 F.2d 617, 631 (3d Cir. 1993).

Plaintiff's allegation that this Court has failed to consider Monell, is misplaced and unsupported. In Monell, the Supreme Court of the United States articulated the circumstances in which suit could be brought against a state officer in his or her official capacity:

> Local governing bodies (and local officials sued in their official capacities) can, therefore, be sued directly under § 1983 for monetary, declaratory, and injunctive relief in those situations where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy. In addition, local governments, like every other § 1983 "person," may be sued for constitutional deprivation visited pursuant to governmental "custom" even though such custom has not received formal approval through the government's official decision-making channels.

436 U.S. at 659. Here, Plaintiff failed to present this Court with evidence that the conduct which formed the basis for the Complaint was "official policy" or "custom" of Defendants. In Monell, clear official policy was at issue. This Court held that prosecutorial immunity should be utilized to dispose of lawsuits prior to trial in order to avoid diverting a prosecutor's office's limited resources to defending civil actions. See Imbler, 424 U.S. at 424-

26. "The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequence in terms of his own potential liability in a suit for damages." Id. at 424.

Plaintiff's argument that this Court failed to deal with probable cause is baseless. This Court thoroughly discussed a number of factors in concluding that the PCPO had sufficient evidence to reasonably suspect that Plaintiff was hindering the purpose of Wallace's prosecution.

### 3. Qualified Immunity

Plaintiff argues that Defendants are not entitled to qualified immunity because their actions were not "objectively reasonable" and "in violation of clearly established law." See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). Plaintiff's argument merely re-articulates the same legal arguments and case law previously considered by this Court. This Court established qualified immunity applies in cases in which reasonable law enforcement officials might disagree regarding whether probable cause existed. See Hunter v. Bryant, 502 U.S. 224, 228 (1991); Malley v. Briggs, 475 U.S. 335, 341 (1986). Here, the record establishes the objective reasonableness of Defendants' actions beyond any material factual dispute. First, this Court held that Avigliano did not have any personal involvement in the decision to charge and prosecute Plaintiff and did not proximately cause any of the injuries for which Plaintiff claims. Plaintiff's suit against Avigliano was found to be based solely on a theory of *respondeat superior* and was thus improper.

Finally, this Court concluded that the County of Passaic ("Passaic County") cannot be held vicariously liable. "When county prosecutors execute their sworn duties to enforce the law by making use of all tools lawfully available to them to combat crime, they act as agents of the

14

State." Wright v. State, 169 N.J. 422, 462 (2001).  As such, this Court held that the prosecutorial Defendants acted as "agents of the State" at the time of their alleged wrongful conduct and therefore Passaic County cannot be held vicariously liable for their actions.  Plaintiff's disagreement with this Court's decision does not satisfy the requirement for a motion for reconsideration.

                4.        Malicious Prosecution, False Arrest, and False Imprisonment

Plaintiff reasserts the argument of lack of probable cause, relying upon Plaintiff's Certification, Hibbert's Certification, Defendants' attempt to obtain a stipulation from the Plaintiff as to the existence of probable cause and the fact that Plaintiff was arrested prior to the subpoena return date.  Plaintiff sets forth the same legal arguments and facts as set forth in the original opposition to Defendants' motion for summary judgement.  This Court addressed each of these issues, concluding that Plaintiff cannot show a lack of probable cause or actual malice on the part of any of the Defendants.  Furthermore, Defendants' actions clearly satisfy the standard articulated by the United States Court of Appeals for the Third Circuit in Orsatti v. N.J. State Police. See 71 F.3d 480, 483 (3d Cir. 1995).  "Probable cause to arrest exists when the facts and circumstances within the arresting officers' knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Id.

This Court has fully addressed Plaintiff's malicious prosecution Complaint and held that the record established beyond any material dispute that Defendants properly exercised their prosecutorial duties in filing and ultimately dismissing the charges against Plaintiff.  Plaintiff has failed to demonstrate that this Court has "overlooked" any dispositive factual issues or

controlling law.

Plaintiff renews the argument that the State Notice of Claims laws are inapplicable in actions alleging violations of federal and state constitutional rights, citing the decisions of both Garlanger v. Verbeke, 223 F. Supp. 2d 596 (D.N.J. 2002) and Fuchilla v. Layman, 109 N.J. 319 (1988).  In Garlanger, however, the plaintiff conceded that his false arrest, malicious prosecution and intentional infliction of emotional distress claims were subject to New Jersey's Tort Claims Act.  See Garlanger, 223 F. Supp. 2d at 602.

This Court has previously concluded that Plaintiff's false arrest and false imprisonment claims are "forever barred" under N.J.S.A. 59:8-8.  See Velez v. City of Jersey City, 180 N.J. 284, 295 (2004).  There is no material dispute that Plaintiff's Notice of Claim, filed on December 26, 2003, is untimely and "forever barred" under the Tort Claims Act.  Even so, this Court has found the existence of probable cause, which serves as a complete defense to a false arrest or false imprisonment claim.  See Bauer v. Borough of Cliffside Park, 225 N.J. Super. 38, 47 (App. Div. 1988).  Plaintiff has not demonstrated any change in controlling law, brought forth previously unavailable evidence or identified a clear error of law or manifest injustice.  For these reasons, Plaintiff's motion for reconsideration is **denied.**

### IV. CONCLUSION

For the reasons stated, it is the finding of this Court that Plaintiff's motion for reconsideration is **denied**. An appropriate Order accompanies this Opinion.

 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:       June ___, 2008
Orig.:      Clerk
cc:         All Counsel of Record
            Hon. Mark Falk, U.S.M.J.
            File